Affirmed by Supreme Court on June 12, 2000.

**PUBLISHED**

**UNITED STATES COURT OF APPEALS**

**FOR THE FOURTH CIRCUIT**

BOBBY LEE RAMDASS,
Petitioner-Appellee,

v.

RONALD J. ANGELONE, Director,
Virginia Department of Corrections,
Respondent-Appellant.

No. 98-30

BOBBY LEE RAMDASS,
Petitioner-Appellant,

v.

RONALD J. ANGELONE, Director,
Virginia Department of Corrections,
Respondent-Appellee.

No. 98-32

Appeal from the United States District Court
for the Eastern District of Virginia, at Norfolk.
Raymond A. Jackson, District Judge.
(CA-96-831-2)

Argued: May 4, 1999

Decided: August 3, 1999

Before WIDENER, MURNAGHAN, and NIEMEYER,
Circuit Judges.

_____

Affirmed in part and reversed in part by published opinion. Judge
Niemeyer wrote the opinion, in which Judge Widener joined. Judge
Murnaghan wrote an opinion concurring in part and dissenting in part.

**COUNSEL**

**ARGUED:** Katherine P. Baldwin, Assistant Attorney General, OFFICE OF THE ATTORNEY GENERAL, Richmond, Virginia, for Appellant. F. Nash Bilisoly, IV, VANDEVENTER BLACK, L.L.P., Norfolk, Virginia, for Appellee. **ON BRIEF:** Mark J. Earley, Attorney General of Virginia, OFFICE OF THE ATTORNEY GENERAL, Richmond, Virginia, for Appellant. John M. Ryan, VANDEVENTER BLACK, L.L.P., Norfolk, Virginia; Michele J. Brace, VIRGINIA CAPITAL REPRESENTATION RESOURCE CENTER, Richmond, Virginia, for Appellee.

_____

**OPINION**

NIEMEYER, Circuit Judge:

A Fairfax County, Virginia court convicted Bobby Lee Ramdass of capital murder and sentenced him to death for the murder of Mohammed Kayani during the robbery of the convenience store where Kayani was a clerk. On Ramdass' petition for a writ of habeas corpus, filed under 28 U.S.C. § 2254, the district court granted the writ and ordered the state court to resentence Ramdass, concluding that the state court had denied Ramdass due process by denying him the opportunity established by Simmons v. South Carolina, 512 U.S. 154 (1994), to tell the jury during sentencing that he was ineligible for parole. The district court rejected the other grounds advanced by Ramdass in his petition.

Accepting the Virginia Supreme Court's state law determination that Ramdass was not, at the time of his sentencing proceedings, legally ineligible for parole, we conclude that Simmons was not applicable. Accordingly, we reverse the district court's order insofar as it concluded that Simmons required the writ to issue. Finding no error in the district court's disposition of the other issues, we affirm the remaining portion of the district court's order.

I

The facts of Kayani's murder are related by the Virginia Supreme Court as follows:

2

During the night of September 1 and early morning of September 2, 1992, Ramdass and Darrell Wilson, both armed with pistols, were returning home in a car with three other men, Shane Singh, Edward O'Connor, and Candelerio Ramirez, after abandoning a plan to rob persons at a Roy Rogers restaurant in Fairfax County. On the way, Ramdass suggested that they rob persons at a 7-Eleven store on Buelah Street in Fairfax County.

Accordingly, near one o'clock on the morning of September 2, the five men entered the 7-Eleven store. Ramdass entered first and "drew" his pistol on Kayani, a 7-Eleven clerk who was behind the cash register. Wilson, who also displayed his pistol, ordered all the customers to lie on the floor and not look at him. The other three men, who were unarmed, took the customers' wallets, money from the cash register, and cigarettes and lottery tickets from the store's stock.

After Ramdass ordered Kayani to open the safe, Kayani knelt down next to the safe and unsuccessfully tried to open it. Ramdass squatted next to Kayani and yelled at him to open the safe "or I'll blow your f------ head off." Wilson fired his pistol at one of the customers on the floor. Immediately thereafter, Singh, standing behind Ramdass, saw Ramdass shoot Kayani in the head on his second attempt to get the weapon to fire.

Just after Ramdass shot Kayani, Ramirez returned from a back room in the store. Ramirez saw Ramdass laughing as he stood over Kayani's body. Later, Ramirez heard Ramdass say that he shot Kayani because he "took too long." Shortly thereafter, Ramirez opened the front door, and Wilson, Singh, and O'Connor ran out. As Ramirez held the door open, he urged Ramdass to "[c]ome on." However, Ramdass was "clicking the gun at the people on the floor" and told Ramirez to "[s]hut up or I'll put one in you." One of the customers also heard the clicking of the gun as Ramdass left.

When they got in the car, Ramirez heard Ramdass ask Wilson, "Why didn't you get rid of the people on the floor?"

3

After the men divided the robbery proceeds at Singh's home, Ramdass told Ramirez, "Don't tell anybody about this [or] I'll kill you and I'll kill your whole family."

Singh, a co-owner of the gun with Ramdass, testified that the gun would not fire unless held at a certain angle because the "bullets" in the chamber were not the right size for the gun. Julian Jay Mason, Jr., a forensic scientist specializing in firearms identification, later examined and test fired the gun. Mason testified that the 9 millimeter cartridges Ramdass used in the gun were smaller than the 38 caliber cartridges specified for the gun. Therefore, when the gun's muzzle was pointed down, the 9 millimeter cartridges slid too far forward to be struck by the firing pin. Mason further testified that when the muzzle was pointed up, the cartridge slid back closer to the firing pin, and the gun could be fired.

Ramdass v. Commonwealth ("Ramdass I "), 437 S.E.2d 566, 568-69 (Va. 1993) (footnote omitted). Following indictment and a trial, a Fairfax County jury found Ramdass guilty of capital murder in the commission of armed robbery as well as illegal use of a firearm. Ramdass had earlier pled guilty to one count of robbery.

At the sentencing phase of trial, the Commonwealth of Virginia sought the death penalty, arguing that Ramdass presented "a continuing serious threat to society" -- the "future dangerousness" predicate for imposition of the death penalty. See Va. Code Ann. § 19.2-264.2. In support of this argument, the Commonwealth presented evidence of Ramdass' history of theft-related crimes beginning at age 14 and his pattern of recidivism during periods of escape or probation. More specifically, the prosecution detailed how, within three months of his release on mandatory parole after serving four years of a seven-year sentence for robbery, Ramdass committed a series of at least six armed robberies. The first two robberies occurred on August 25, 1992, when Ramdass robbed a Pizza Hut in Fairfax County, abducting a woman and hitting a man. Four days later, he robbed a clerk at an apartment-hotel in Alexandria and struck him in the head with a gun. On August 30, 1992, he shot and robbed a cab driver. Later that evening, he robbed a clerk at a Domino's Pizza in Arlington. Finally, Ramdass killed Mohammed Kayani on September 2, 1992, during the

4

sixth robbery in this eight day spree. See Ramdass I, 437 S.E.2d at 574. Ramdass' counsel responded to the prosecution's argument by asserting that "Ramdass will never be out of jail. Your sentence today will insure that if he lives to be a hundred and twenty two, he will spend the rest of his life in prison."

During sentencing deliberations, the jury asked:"if the Defendant is given life, is there a possibility of parole at some time before his natural death?" While recognizing that Virginia law did not permit a sentencing jury to be informed of the defendant's parole eligibility, Ramdass' counsel nevertheless maintained that "the [jurors'] question itself implies that they have a perception that if they give a life sentence that he will be out in a very short period of time" and that it was necessary to inform the jury otherwise with "some kind of language that would balance out that perception." Over defense counsel's objection, the trial judge told the jurors that they"should impose such punishment as [they] feel is just under the evidence and within the instructions of the Court" and that they "are not to concern [them]selves with what may happen afterwards." The jury returned a verdict recommending death on the capital murder count, based upon Ramdass' "future dangerousness," and recommending four years imprisonment on the firearm count.

At the sentencing hearing in April 1993, Ramdass' counsel urged the court to impose a sentence of life in prison instead of death in light of Ramdass' ineligibility for parole under Virginia's three-strikes provision.[1] See Va. Code Ann. § 53.1-151(B1). Defense coun-

_____

[1] Ramdass' parole eligibility at the time of the sentencing hearing was governed by Virginia's three-strikes statute, which provides that an individual is ineligible for parole if he has been "convicted of three separate felony offenses" of murder, rape, or armed robbery, which "were not part of a common act, transaction or scheme." Va. Code Ann. § 53.1-151(B1). At the time the jury was deliberating his sentence in this case, Ramdass had already been sentenced (the week before) to 76 years imprisonment in connection with the Pizza Hut armed robbery. In addition, about three weeks earlier, on January 7, 1993, a jury had returned a verdict finding Ramdass guilty in the Domino's Pizza armed robbery, for which it recommended an 18-year sentence. The court, however, had not yet entered judgment in that case. It did so nearly three weeks after the jury in this case concluded its sentencing deliberations.

5

sel proffered to the court that three jurors had told him that they would have imposed a life sentence rather than death if they had known that Ramdass would not be eligible for parole. Rejecting defense counsel's request, the court sentenced Ramdass to death.

On direct appeal to the Virginia Supreme Court, Ramdass argued, inter alia, that his death sentence violated the Sixth, Eighth, and Fourteenth Amendments to the United States Constitution because the trial judge prevented him from telling the jury that he was parole ineligible, a potentially mitigating factor. Rejecting that argument, the Virginia Supreme Court stated that Ramdass had advanced "no persuasive reason" to modify prior Virginia precedent holding that "a jury should not hear evidence of parole eligibility or ineligibility because it is not a relevant consideration in fixing the appropriate sentence." Ramdass I, 437 S.E.2d at 573 (citing Wright v. Commonwealth, 427 S.E.2d 379, 392 (Va. 1993)).

From that court's decision, Ramdass filed a petition for writ of certiorari with the United States Supreme Court. While that petition was pending, the United States Supreme Court decided Simmons v. South Carolina, 512 U.S. 154 (1994), holding that when a prosecutor argues future dangerousness to a capital sentencing jury, a defendant who is parole ineligible has a due process right to respond to that argument by informing the jury, through argument or instruction, of his ineligibility for parole. After deciding Simmons, the Supreme Court granted Ramdass' petition for certiorari and remanded his case to the Virginia Supreme Court for reconsideration in light of Simmons. See Ramdass v. Virginia, 512 U.S. 1217 (1994).

On remand, Ramdass asserted that because he was ineligible for parole under Virginia's three-strikes statute, Simmons applied to his case and required that he be allowed to "meet the state's case against him" by informing the jury of his parole ineligibility. The Virginia Supreme Court, however, reaffirmed Ramdass' death sentence, concluding that the holding of Simmons was not implicated. Noting that Simmons applies "only if Ramdass was ineligible for parole when the jury was considering his sentence," the Virginia Supreme Court determined that Ramdass was "not ineligible for parole since he had only two separate felony offenses within the meaning of [the three-strikes provision]." Ramdass v. Commonwealth ("Ramdass II"), 450 S.E.2d

6

360, 361 (Va. 1994) (internal quotation marks omitted). While recognizing the Pizza Hut conviction and the Kayani murder conviction as predicate offenses under the three-strikes statute, the court rejected Ramdass' argument that the January 7, 1993 jury verdict of guilty in the Domino's Pizza robbery was also a predicate conviction because "[j]udgment had not been entered on that verdict." Id. Accordingly, the court stated, "it cannot be considered as a conviction" under the three-strikes provision. Id. (citing Smith v. Commonwealth, 113 S.E. 707, 709 (1922)).

Pursuing state post-conviction relief, Ramdass again asserted in his state habeas petition that Simmons required that the jury be accurately informed as to his parole eligibility status, although he did not specifically challenge the Virginia Supreme Court's determination in Ramdass II that under Virginia law he was not ineligible for parole. Ramdass also claimed that his trial counsel were constitutionally ineffective for, inter alia, failing to investigate and to object to the appointment of Dr. Stanton Samenow as his mental health expert because Dr. Samenow was "notoriously pro-prosecution" and refused to work with the defense. In arguing the ineffective assistance of counsel, Ramdass stated also that he was denied the reasonable assistance of a mental health expert at trial, in violation of both Ake v. Oklahoma, 470 U.S. 68 (1985) (holding that in limited circumstances, a criminal defendant has a Fourteenth Amendment right to access to a competent psychiatrist) and Virginia Code § 19.2-264.3:1 (entitling indigent capital defendants to the assistance of a mental health expert). The Virginia Supreme Court dismissed the petition. It ruled that Ramdass' Simmons claim was barred from review under the rule of Hawks v. Cox, 175 S.E.2d 271 (Va. 1970) (holding that an issue previously decided against the petitioner on direct appeal may not again be considered on post-conviction review), and it summarily rejected Ramdass' ineffective assistance of counsel claim.

Seeking habeas relief in the federal courts, Ramdass filed this petition in February 1997, alleging, among other things, unconstitutional error in the trial court's failure to allow the jury to consider his alleged parole ineligibility. He also claimed that trial counsel were constitutionally ineffective for failing to investigate the views and reputation of Dr. Samenow, for failing to object to his appointment, and for failing to seek alternative mental health testimony. Finally, he

7

alleged that his Fourteenth Amendment right to the assistance of a mental health expert had been violated, either under Ake or by deprivation of a state-created right to such assistance provided in Va. Code Ann. § 19.2-264.3:1. The district court granted Ramdass a writ of habeas corpus based on the Simmons claim, dismissed the remaining claims, and ordered the state trial court to resentence him. See Ramdass v. Angelone, 28 F. Supp.2d 343, 356-74 (E.D. Va. 1998). From the district court's order, the Commonwealth of Virginia appealed to challenge the Simmons ruling, and Ramdass cross-appealed to preserve his claim on various other grounds rejected by the district court.

II

In its appeal, the Commonwealth of Virginia raises two issues: (1) that the Simmons claim was defaulted because it was not properly raised in state court, and (2) that Ramdass is, in any case, not entitled to relief under Simmons because, had he been sentenced to life imprisonment, he would not have been parole ineligible under Virginia law.

The Commonwealth's first point -- that Ramdass failed to preserve his Simmons claim by raising it in state court as required by 28 U.S.C. § 2254(b) (barring federal courts from entertaining habeas petitions from individuals who have not exhausted their state court remedies) -- does not merit an extended discussion. Prior to filing his federal habeas petition, Ramdass raised his core Simmons claim -- that due process entitled him to inform the jury that he was ineligible for parole -- to the Virginia Supreme Court on at least three separate occasions: in his first direct appeal, in his direct appeal on remand from the United States Supreme Court, and in his state habeas petition. Indeed, the most compelling evidence that Ramdass did not default his Simmons claim is the fact that the Virginia Supreme Court disposed of that claim by declaring it barred from review on state habeas by the rule of Hawks v. Cox, 175 S.E.2d 271 (Va. 1970), which proscribes the relitigation of claims that have already been adjudicated on the merits in state court on direct appeal.

While it is true, as the Commonwealth points out, that Ramdass did not specifically contest the parole eligibility determination in his state habeas petition, he did assert the broader, more basic claim, which he

8

had made all along, that the trial court's refusal to give the jury that information on his request violated his constitutional right to due process. We believe that the Commonwealth's characterization of Ramdass' Simmons claim for this purpose is unduly narrow. Accordingly, we conclude that the district court did not err in finding that the Simmons claim was not defaulted. We now turn to the merits.[2]

A

Understanding first the precise rule in Simmons will aid our analysis of Ramdass' claims. In Simmons v. South Carolina, 512 U.S. 154 (1994), the prosecutor had argued to the jury during the penalty phase of trial that the death sentence was appropriate because Simmons, who had assaulted and killed several elderly women, was a future danger to society. To rebut this argument, Simmons contended that because he was only a threat to elderly women, none of whom he would ever encounter in prison, he did not pose such a danger. He proffered evidence that he was legally ineligible for parole and requested an instruction to the jury that if sentenced to life imprisonment, he would remain imprisoned "for the balance of his natural life." Id. at 160. The trial court denied Simmons' request to inform the jury, either by argument or instruction, of his ineligibility for

_____

[2] The Anti-Terrorism and Effective Death Penalty Act of 1996 ("AEDPA"), establishing the applicable standard of review, provides in relevant part:

> An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim --

> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or

> (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d).

9

parole under South Carolina law. The United States Supreme Court ruled that this denied Simmons due process as guaranteed by the Fourteenth Amendment. Id. at 156, 171 (Blackmun, J., plurality opinion); id. at 178 (O'Connor, J., concurring). We recognize Justice O'Connor's concurrence as the controlling opinion in Simmons because it represents the narrowest grounds upon which a majority of the Court agreed. See Keel v. French, 162 F.3d 263, 270 (4th Cir. 1998), cert. denied, No. 98-9324, 1999 WL 317623 (U.S. June 14, 1999); Townes v. Murray, 68 F.3d 840, 849 (4th Cir. 1995); see also O'Dell v. Netherland, 521 U.S. 151, 158 (1997).

Writing for the plurality, Justice Blackmun held"that where the defendant's future dangerousness is at issue, and state law prohibits the defendant's release on parole, due process requires that the sentencing jury be informed that the defendant is parole ineligible." Simmons, 512 U.S. at 156. When the jury lacks such information, the plurality noted, there is a real danger that the state will "succeed[ ] in securing a death sentence on the ground, at least in part, of . . . future dangerousness, while at the same time concealing from the sentencing jury the true meaning of its noncapital sentencing alternative, namely, that life imprisonment meant life without parole." Id. at 162.

In her concurrence, Justice O'Connor recognized that when a state prosecutor argues future dangerousness to the jury, the defendant's only opportunity to rebut that argument will often be by telling the jury that "he will never be released from prison." Id. at 177. Justice O'Connor went on to conclude that

> in such a case the defendant should be allowed to bring his parole ineligibility to the jury's attention--by way of argument by defense counsel or an instruction from the court-- as a means of responding to the State's showing of future dangerousness. And despite our general deference to state decisions regarding what the jury should be told about sentencing, I agree that due process requires that the defendant be allowed to do so in cases in which the only available alternative sentence to death is life imprisonment without possibility of parole and the prosecution argues that the defendant will pose a threat to society in the future.

10

<u>Id</u>.

Accordingly, the grounds on which both the plurality and Justice O'Connor agree are summarized in <u>Townes v. Murray</u>, 68 F.3d 840, 850 (4th Cir. 1995):

> <u>Simmons</u> does not hold, as the plurality opinion at one point put it, that "due process requires that the sentencing jury be informed that the defendant is parole ineligible," <u>id</u>. at [156] (plurality opinion). It only holds more narrowly that "[w]here the State puts the defendant's future dangerousness in issue, and the only available alternative sentence to death is life imprisonment without possibility of parole, due process entitles the defendant to inform the capital sentencing jury -- by either argument or instruction -- that he is parole ineligible." <u>Id</u>. at [177] (O'Connor, J.). . . . Put in terms familiar from philosophical and jurisprudential debates over the proper meaning of "equality" and "equal protection," the defendant's right, under <u>Simmons</u>, is one of opportunity, not of result.

In short, a defendant in a capital case is constitutionally entitled, under <u>Simmons</u>, to inform the sentencing jury of parole ineligibility by argument or, on his request, by instruction from the court when (1) the prosecution makes the "future dangerousness" argument that the defendant will pose a threat to society in the future and (2) the only available alternative sentence to death is life imprisonment without the possibility of parole.

It is undisputed in this case that Ramdass meets the first requirement. The prosecutor at Ramdass' sentencing proceeding argued that the death penalty was necessary solely because Ramdass was a future danger to society. Whether Ramdass meets the second requirement is the principal source of dispute in the appeal before us.**3** Resolution of

_____

**3** It is undisputed that the Supreme Court decided <u>Simmons before</u> Ramdass' direct appeal was final. <u>See Ramdass v. Virginia</u>, 512 U.S. 1217 (1994) (granting Ramdass' petition for certiorari on direct appeal and remanding to the Virginia Supreme Court for reconsideration in light

11

this issue depends on how Simmons defines parole ineligibility and whether, under the standards for making that determination, Ramdass was ineligible for parole at the time of the penalty phase of trial.

B

In Ramdass II, the Virginia Supreme Court held that Simmons did not apply to Ramdass' case because Simmons required legal ineligibility for parole and Ramdass was not ineligible for parole under Virginia law. The Court concluded that if sentenced to life imprisonment on the Kayani murder, Ramdass would not have been"convicted of three separate felony offenses" of murder, rape, or armed robbery as required for parole ineligibility under Virginia's three-strikes statute. Va. Code Ann. § 53.1-151(B1). According to the court, Ramdass' qualifying convictions at the time were (1) the Pizza Hut armed robbery conviction, upon which judgment had been entered, and (2) the Kayani murder conviction. The court acknowledged that a jury had also returned a verdict finding Ramdass guilty of armed robbery in the Domino's Pizza incident. But, relying on Smith v. Commonwealth, 113 S.E. 707 (Va. 1922), which held that conviction does not occur until judgment is entered, the court concluded that the Domino's Pizza robbery could not be counted as the third strike under the Virginia statute because the court had not entered judgment on that guilty verdict at the time that the jury in this case was deliberating Ramdass' sentence. See Ramdass II, 450 S.E.2d at 361.

Ramdass contends that the Virginia Supreme Court misconstrued Simmons as requiring a state law determination of parole ineligibility rather than "the functional and common-sense[im]possibility of parole" as the trigger for the right to inform the jury of parole ineligibility. Moreover, even if state law governs the parole ineligibility determination for purposes of applying Simmons , Ramdass, in sub-

_____

of Simmons); cf. O'Dell v. Netherland , 521 U.S. 151 (1997) (declaring that Simmons announced a "new rule" under Teague for all already final convictions). Accordingly, the anti-retroactivity component of § 2254(d) would not bar application of Simmons to Ramdass' habeas petition on retroactivity grounds if Simmons is otherwise applicable as a matter of substantive law.

12

stance, accuses the Virginia Supreme Court of attempting to avoid the application of <u>Simmons</u> by adopting a novel and highly technical definition of "convicted" in the three-strikes provision. Further, Ramdass maintains that even if a conviction requires the entry of judgment, as <u>Ramdass II</u> held, the Domino's Pizza guilty verdict should count as a conviction because the entry of judgment was nondiscretionary, purely ministerial, and legally insignificant. In short, Ramdass argues for a pragmatic, functional, nonlegalistic concept of when a defendant is ineligible for parole.

Because Ramdass advances an erroneous interpretation of <u>Simmons</u>, we must begin by turning to <u>Simmons</u> itself. <u>Simmons</u> grants capital defendants a due process right in state trials to advise a jury of parole ineligibility only when the only alternative to a sentence of death is a sentence of life imprisonment without the possibility of parole. That condition cannot be a general question of practicality determined by a federal habeas court, as Ramdass argues. Parole eligibility is a state law question. Under <u>Simmons</u>, only those capital defendants who are parole ineligible <u>under state law</u> at sentencing are constitutionally entitled to inform the jury that they will be ineligible for parole if sentenced to life imprisonment. In other words, a trial court must determine the question of whether <u>Simmons</u> applies to a particular defendant based on whether <u>state law</u> renders that defendant ineligible for parole. <u>See Simmons</u>, 512 U.S. at 156 (Blackmun, J., plurality opinion) (limiting the holding to situations where "state law prohibits the defendant's release on parole"); <u>id</u>. at 176 (O'Connor, J., concurring) (citing South Carolina statutes to demonstrate that for Simmons "the only available alternative sentence to death . . . was life imprisonment without the possibility of parole").

When Ramdass argues that <u>Simmons</u>' applicability is not conditioned on "a state's determination of `parole ineligibility' at the moment of capital sentencing" but rather on a nonlegalistic "common-sense [im]possibility of parole," he advances a new interpretation of <u>Simmons</u> that is simply incompatible with the logic of <u>Simmons</u> itself. In relying on Justice O'Connor's statement that <u>Simmons</u> applies in "cases in which the only available alternative sentence to death . . . is life imprisonment without possibility of parole," <u>id</u>. at 177, to argue that a federal, functional standard applies to parole ineligibility determinations, Ramdass ignores the <u>Simmons</u> plurality's repeated refer-

13

ence to state law as the determining factor for whether or not a defendant is ineligible for parole. See, e.g., id. at 156 ("We hold that where the defendant's future dangerousness is at issue, and state law prohibits the defendant's release on parole, due process requires that the sentencing jury be informed that the defendant is parole ineligible" (emphasis added)); id. at 165 (observing that the defendant's ability to use parole ineligibility to rebut a future dangerousness argument depends "on the fact that he was legally ineligible for parole" (emphasis added)); id. at 165 n.5 ("The Due Process Clause will not tolerate placing a capital defendant in a straitjacket by barring him from rebutting the prosecution's arguments of future dangerousness with the fact that he is ineligible for parole under state law" (emphasis added)). Moreover, his reliance on Justice O'Connor's language is also misplaced. Ramdass' interpretation not only reads too much into Justice O'Connor's phraseology, but it also takes the phrase out of context. Nothing in Justice O'Connor's concurrence indicates that she disagreed with the plurality and believed that the parole eligibility determination was governed by anything other than state law. On the contrary, she cited state law to show that Simmons himself was ineligible for parole, see id. at 176, and she concluded that Simmons was entitled to communicate his parole ineligibility to the jury because "the only alternative sentence to death under state law was life imprisonment without possibility of parole," id. at 178 (emphasis added). See also id. at 176 ("In a State in which parole is available, the Constitution does not require (or preclude) jury consideration of that fact").

In addition, Ramdass' argument for equating legal parole ineligibility with a common-sense impossibility of parole is at odds with case law from this circuit. Under Ramdass' theory, defendants who are, as a practical matter, unlikely to be paroled -- perhaps because a state only rarely grants parole or because the defendant would be over a hundred years old when finally legally eligible-- would be entitled to a Simmons instruction. Yet, we have consistently refused to apply Simmons to cases in which the defendants were not legally ineligible for parole at the time of sentencing. See, e.g., Roach v. Angelone, 176 F.3d 210, 220 (4th Cir. 1999) (refusing to extend Simmons to apply to a defendant who would not become eligible for parole for twenty-five years, under state law); Keel v. French, 162 F.3d 263, 270 (4th Cir. 1998) (holding that "[s]ince Keel would have been eligible for

14

parole had he not been sentenced to death, [citing state law], he is not entitled to any relief under our current interpretation of Simmons"), cert. denied, No. 98-9324, 1999 WL 317623 (U.S. June 14, 1999); Fitzgerald v. Greene, 150 F.3d 357, 367 (4th Cir.) (declining to apply Simmons after Virginia Supreme Court determined defendant was not ineligible for parole under the three strikes statute because his convictions arose out of the same transaction), cert. denied, 119 S. Ct. 389 (1998).

Finally, as a matter of simple logic, the fact that a defendant will have no possibility of parole if given a life sentence can only stem from the legal conclusion that state law bars eligibility for parole. Because parole eligibility is entirely a creature of state law, Ramdass' conception of practical or functional parole eligibility must inevitably collapse into a determination of state law.

Even were we persuaded by Ramdass' theory that practical rather than legal parole ineligibility suffices to trigger Simmons, we would conclude that it was not "clearly established" as required by 28 U.S.C. § 2254(d)(1). Cf. Keel, 162 F.3d at 269. This statutory provision, which requires that the state court decision at issue be inconsistent with "clearly established Federal law, as determined by the Supreme Court of the United States," 28 U.S.C. § 2254(d)(1), "imports an anti-retroactivity principle into federal habeas law." Green v. French, 143 F.3d 865, 873 (4th Cir. 1998). It resembles, but does not simply codify, the anti-retroactivity doctrine of Teague v. Lane, 489 U.S. 288 (1989). In fact, we have observed that the standard of § 2254(d)(1) is "even more stringent" than Teague. Weeks v. Angelone, 176 F.3d 249, 266 n.9 (4th Cir. 1999); see also Gosier v. Welborn, 175 F.3d 504, 510 (7th Cir. 1999) (noting that § 2254(d)(1)"closes the escape hatches in Teague").**4** Thus, either under Teague or under § 2254(d)(1), Ramdass' argument for an extension of Simmons would fail.

_____

**4** In fact, § 2254(d)(1) can be seen as stricter in that it does not recognize Teague's two traditional exceptions which permit retroactive application of new rules which either "place[ ] certain kinds of primary, private individual conduct beyond the power of the criminal law-making authority to proscribe" or are "watershed rules of criminal procedure." See Green, 143 F.3d at 873 (quoting Teague , 489 U.S. at 311-12).

15

C

Having determined that Simmons applies only to a capital defendant who, under state law, is legally ineligible for parole at the time of sentencing, we turn to the question of whether Ramdass meets this threshold requirement. The Virginia Supreme Court held that, under the three-strikes statute, he did not. See Ramdass II, 450 S.E.2d at 361. The district court held that the state court's conclusion was an unreasonable determination of fact. See Ramdass v. Angelone, 28 F. Supp.2d at 365.

As an initial matter, we clarify that the parole eligibility determination is a question of law, not fact, as the Virginia Supreme Court has recognized. See Fitzgerald, 150 F.3d at 367 (citing Fitzgerald v. Commonwealth, 455 S.E.2d 506, 510 (Va. 1995)). Accordingly, to the extent that the district court's decision to grant the writ rested on the unreasonable-determination-of-fact rationale, it cannot stand.

More significantly, parole eligibility is a question of state law and therefore is not cognizable on federal habeas review. The AEDPA provides explicitly that a federal court "shall entertain an application for a writ of habeas corpus in behalf of a person in custody pursuant to the judgment of a State court only on the ground that he is in custody in violation of the Constitution or laws or treaties of the United States." 28 U.S.C. § 2254(a) (emphasis added). Because the definition of what constitutes a conviction in Virginia's three-strikes statute and the application of that state law definition to the facts of Ramdass' case are purely questions of state law, we have no power to revisit these questions on federal habeas review.

Even if we were not so constrained, however, we would be unpersuaded by Ramdass' argument that the Virginia Supreme Court adopted an artful, form-over-substance interpretation of the three-strikes statute to thwart his Simmons claim. At most, Ramdass can complain about the effect of the random timing of his trials. If judgment had been entered on the Domino's Pizza robbery verdict 19 days earlier, then Ramdass would have been ineligible for parole under the three-strikes statute and accordingly entitled to inform the jury of that fact. However, given that Ramdass committed the Pizza Hut robbery, the Domino's Pizza robbery, the Kayani murder and robbery, and sev-

16

eral other potentially qualifying offenses within several days of each other, the random order in which he was tried for these various offenses was entirely foreseeable, dictated only by the docket of the relevant county court. In fact, it is equally possible that Ramdass could have been tried on the most serious charge-- the Kayani murder -- first, in which case he would have had only one qualifying conviction at the time of sentencing and, thus, would be an additional conviction short of making a valid Simmons claim.

Second, Ramdass characterizes the Virginia Supreme Court's reliance on Smith v. Commonwealth, 113 S.E. 707 (1922) (discussing the meaning of the term "conviction" in the context of a statute removing public officials from office upon conviction of crimes of moral turpitude), as a judicial version of grasping at straws. Yet, sound reasoning supports Smith's holding that conviction requires an entry of judgment, rather than simply a jury verdict. Cf. Fed. R. Crim. P. 32(d)(1) (requiring an entry of judgment signed by the judge). Even though Smith's factual predicate is wholly unrelated to parole eligibility, the age-old rationale underlying its definition of conviction is designed to protect defendants. Requiring the entry of judgment-- even if it appears to be only a formal step of the process-- in contexts in which additional negative consequences are to be imposed based on the conviction, provides an additional layer of procedural protection against unfairness or corruption.

Third, Ramdass attempts to portray the Smith decision as an irrelevant relic. While the Virginia Supreme Court had not cited this case in a published opinion since the 1920s, the intermediate appellate court has observed that "Virginia courts have defined the word `convicted' in accordance with Smith, but only in the context of a defendant who has been confronted with some type of forfeiture." Fields v. Commonwealth, 361 S.E.2d 359, 362 (Va. Ct. App. 1987) (purporting to limit Smith to its facts). As a type of forfeiture, parole ineligibility fits neatly within the narrow circumstances in which the Smith definition of conviction is appropriate, or even necessary. Upon amassing a given number of convictions for certain crimes, a defendant forfeits his right to be considered for parole under the standard operation of the parole system. This is precisely the kind of serious deprivation that should not occur without the solemn imprimatur of the court's entry of judgment on the decision of the jury. Finally, the

17

fact that the Virginia Supreme Court has remanded for re-sentencing upon finding a Simmons violation in another case defeats the implication that the Virginia Supreme Court is somehow hostile to enforcing the Simmons right. See Mickens v. Commonwealth, 457 S.E.2d 9 (Va. 1995).

We have included this discussion only in an effort to dispel Ramdass' insinuation that the Virginia Supreme Court acted craftily in denying his Simmons claim. In the end, however, we reiterate that this dispute about the meaning of the Virginia three-strikes statute is wholly a question of state law that cannot provide the basis for a federal court to grant the writ of habeas corpus. See 28 U.S.C. § 2254(a).

III

On his cross-appeal, Ramdass contends that the district court erred in dismissing, either as defaulted or meritless, the following four other claims in support of his habeas petition: (1) the Virginia Supreme Court's determination that he was eligible for parole as of the time of sentencing under Virginia law was so arbitrary as to violate due process; (2) the denial of access to assistance from a mental health expert violated his right to due process; (3) the ineffective assistance of counsel denied him the constitutional right to counsel; and (4) the denial of funds for expert assistance and an evidentiary hearing violated his right to due process. We address these claims in order.

A

First, Ramdass claims that the Virginia Supreme Court's interpretation of the three-strikes provision was so inconsistent with Virginia precedent and so arbitrary that it violated due process. In response to the Commonwealth's contention that this claim was defaulted by failure to raise it in state court, he argues that it could not have been defaulted because the Virginia Supreme Court in fact addressed it simply by concluding that he was parole eligible under Virginia law. This argument, however, proves too much. Carried to its logical conclusion, Ramdass' argument would mean that every judicial ruling carries with it an implicit, due process rubber-stamp. There is no evidence that the Virginia Supreme Court's parole eligibility determination silently encompassed an additional conclusion that the parole

18

eligibility finding itself comported with due process. Because, as Ramdass concedes, ineffective assistance of state habeas counsel will not show cause for his default, see Mackall v. Angelone, 131 F.3d 442, 446-49 (4th Cir. 1997), we have no power to reach the merits of this independent due process claim on federal habeas. See 28 U.S.C. § 2254(b)(1)(A). In any event, we would reject the claim on the merits for the reasons given in our discussion in Part II(C), above.

B

Ramdass next challenges the district court's rejection of his claims that he was illegally denied the assistance of a mental health expert based on two, separate theories: (1) the due process right to access to a mental health expert under Ake v. Oklahoma, 470 U.S. 68 (1985), and (2) the due process right to non-arbitrary enforcement of Virginia Code § 19.2-264.3:1, which grants capital defendants the assistance of a mental health expert. Although the district court did not distinguish between these two arguments, holding that they were defaulted, we conclude (1) that the Ake claim was preserved but that the Virginia Supreme Court did not unreasonably apply clearly established federal law in dismissing it, and (2) that the claim based on the arbitrary enforcement of state law was defaulted.

The standard for state court exhaustion prior to filing a federal habeas petition is not, as the Commonwealth suggests, whether a petitioner presented the "identical" claim in state court but rather whether he "fairly presented" his federal claim to the state court. "A claim is fairly presented when the petitioner presented to the state courts the substance of his federal habeas corpus claim. The ground relied upon must be presented face-up and squarely; the federal question must be plainly defined." Matthews v. Evatt, 105 F.3d 907, 911 (4th Cir. 1997) (emphasis added and internal quotation marks and citations omitted).

Under this standard, Ramdass did include in his state habeas petition at least the "substance" of his federal claim that he was denied a mental health expert in violation of due process under Ake. Even though the claim appeared under the heading of ineffective assistance of counsel and the sub-heading of failure to secure a mental health expert, Ramdass nonetheless grounded his claim on the seminal Supreme Court case, Ake. He summarized the holding of Ake and

19

alleged facts in support of his claim that Dr. Samenow was pro-prosecution and refused to assist the defense by identifying any mitigating factors for the sentencing phase. Even so, the Virginia Supreme Court dismissed this claim, finding that it had no merit. In doing so, the Virginia Supreme Court did not unreasonably apply clearly established federal law. See 28 U.S.C. § 2254(d).

Ake provides a right to assistance of a mental health expert only if a defendant made a showing to the trial court that his mental state was at issue in his defense of the charges or if, in arguing future dangerousness in the sentencing phase, the prosecution used expert psychiatric testimony. See Ake, 470 U.S. at 82-83 (noting that the need for the assistance of a psychiatrist is "readily apparent" either when "the defendant is able to make an ex parte threshold showing to the trial court that his sanity is likely to be a significant factor in his defense" or "when the State presents psychiatric evidence of the [capital] defendant's future dangerousness" during the penalty phase (emphasis added)). Neither condition was met here.

The due process claim for the arbitrary enforcement of a state statute was defaulted because, in his state habeas petition, Ramdass stated only that his rights under the state statute had been denied. This is no more than a state law question. Ramdass did not make the further argument, necessary to make the claim cognizable on federal habeas review, that this denial constituted a violation of his right to due process under the Fourteenth Amendment. See 28 U.S.C. § 2254(a).

C

In support of his ineffective assistance of counsel claim, Ramdass argues that his trial counsel were deficient in failing to object to Dr. Samenow's appointment and in failing to seek assistance from an alternative mental health expert once they realized that Dr. Samenow would not be helpful. We conclude that the Virginia Supreme Court did not unreasonably apply clearly established federal law in dismissing this claim for lack of merit. See 28 U.S.C. § 2254(d).

To prevail on his ineffective assistance of counsel claim, Ramdass must meet two well-established requirements. First, he "must show that counsel's representation fell below an objective standard of rea-

sonableness." Strickland v. Washington, 466 U.S. 668, 688 (1984). This is a difficult showing to make because in assessing the reasonableness of counsel's course of action, "[o]ur review . . . is highly deferential" to counsel. Wilson v. Greene, 155 F.3d 396, 403 (4th Cir. 1998) (citing Strickland, 466 U.S. at 689). Second, he must demonstrate "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." Strickland, 466 U.S. at 694. The district court, assuming arguendo that Ramdass could satisfy the deficiency prong of Strickland, ruled that Ramdass's ineffective assistance claim failed because he could show no prejudice. See Ramdass, 28 F. Supp.2d at 370. We agree.

Instead of presenting testimony from Dr. Samenow, who had failed to identify any mitigating factors in his report on Ramdass, Ramdass' trial counsel presented testimony from Ramdass, his brother, his mother, and a probation officer during the penalty phase in an attempt to establish mitigating factors. Because the jury was aware of the dysfunctional circumstances of Ramdass' childhood, Ramdass cannot now show a reasonable probability that psychiatric testimony as to the same circumstances would produce a different result. Moreover, neither Ake, 470 U.S. at 83, nor Virginia Code§ 19.2-264.3:1(A) creates a right to a particular expert. Accordingly, Ramdass cannot show a reasonable probability, as required by Strickland, that the Virginia Supreme Court would have either removed Dr. Samenow upon objection or appointed an additional expert upon request.

D

On Ramdass' final point, we conclude that, because Ramdass failed to make out a prima facie case as to his mental health expert and ineffective assistance claims, the district court did not err in denying Ramdass funds for expert assistance or an evidentiary hearing.

IV

In sum, we reverse the district court's decision to grant Bobby Lee Ramdass' petition for a writ of habeas corpus based upon a Simmons violation. Because Simmons is limited to situations where state law renders the defendant legally, not merely practically, ineligible for parole, we conclude that the Virginia Supreme Court did not unrea-

21

sonably apply clearly established federal law when it ruled that Simmons did not apply to Ramdass' case because Ramdass was not ineligible for parole under Virginia law. In addition, we affirm the district court's opinion as to the remaining issues raised by Ramdass on cross-appeal. The judgment of the district court is

AFFIRMED IN PART AND REVERSED IN PART.

MURNAGHAN, Circuit Judge, concurring in part and dissenting in part:

I concur in the majority's handling of most of the issues raised by Ramdass.[1] I respectfully dissent, however, from the majority's treat-
(Text continued on page 24)

_____

[1] I note that I concur only in the judgment on the Ake claim. Ake provides that under certain circumstances "the State must, at a minimum, assure the defendant access to a competent psychiatrist who will conduct an appropriate examination and assist in evaluation, preparation and presentation of the defense." Ake v. Oklahoma , 470 U.S. 68, 83 (1985). Ramdass presented ample evidence to show that Dr. Stanton Samenow's professed and public views make him incompetent to aid a defendant in finding and presenting mitigating factors at a defendant's sentencing phase, and that Dr. Samenow did not conduct an appropriate examination. Dr. Samenow has publicly stated that criminals are a "different breed of person," (J.A. at 347), who seek to manipulate the system for their own ends. He has abandoned sociologic, psychologic, and mental illness explanations for criminal behavior and holds the view that "[m]ost diagnoses of mental illness [in criminals] resulted from the criminal's fabrications." (J.A. at 348.) Dr. Samenow's published works state that circumstances have nothing to do with criminal violations and that "providing the criminal with an opportunity to present excuses deferred him and us further and further from change." (J.A. at 348.) According to a report submitted to the district court by Dr. Reuben Koller, Dr. Samenow's views obviate his ability to evaluate mitigating factors relating to the history or character of a criminal defendant"because he is of the opinion that no mitigating factors can exist." (J.A. at 474.) Even if Dr. Samenow were to abandon his public beliefs and identify mitigating factors, his testimony would be subject to damaging impeachment on cross-examination from his own publicly expressed views. In fact, the record shows that just that happened at another capital sentencing trial. Further, Dr. Koller opined that Dr. Samenow's examination of Ramdass was "in-

22

complete, deficient and inadequate according to conventional psychological standards." (Id.) Dr. Koller's preliminary evaluation of the records available to Dr. Samenow indicated seven specific factors ignored by Dr. Samenow which could be considered significant factors in mitigation. It is also worth noting that Dr. Samenow has been at the center of at least two other constitutional challenges. See Swann v. Taylor, 173 F.3d 425, 1999 WL 92435, at *6-*9 (4th Cir. Feb. 18, 1999) (unpublished table disposition) (claiming Ake violation); Wright v. Angelone, 151 F.3d 151, 161 (4th Cir. 1998) (claiming ineffective assistance of counsel for using Dr. Samenow).

We have suggested that Ake requires only an expert and an examination, see Wilson v. Greene, 155 F.3d 396, 401 (4th Cir. 1998), not a competent expert and an appropriate examination, but see id. at 409 (Michael, J., concurring) (noting that the Wilson majority did not squarely reject the right to an appropriate examination). I agree that Ake does not require "effective assistance of a psychiatric expert." See, e.g., Pruett v. Thompson, 996 F.2d 1560, 1573 n. 12 (4th Cir.1993). In my view, though, the Supreme Court requires more than just a warm body with a prefix attached to his name; Ake provides a right to a "competent expert" and an "appropriate examination." Ake, 470 U.S. at 83. (I note that competence and appropriateness, based on objective professional criteria, are entirely different than effectiveness).

Ultimately, however, Ramdass' Ake claim must fail. On direct appeal I would follow the Tenth Circuit and hold that Ake applies when the state presents any evidence on future dangerousness and the indigent defendant establishes the likelihood his mental condition is a significant mitigating factor. See Castro v. Oklahoma, 71 F.3d 1502, 1513 (10th Cir. 1995); Liles v. Saffle, 945 F.2d 333, 240-41 (10th Cir. 1991). Compare Tuggle v. Netherland, 79 F.3d 1386, 1387-88 (4th Cir. 1996) (describing the Ake right as arising when the prosecution first presents psychiatric testimony), with Swann, 173 F.3d 425, 1999 WL 92435, at *2 (stating Ake applies "when a capital defendant's future dangerousness is to be a significant factor at the penalty phase of the trial"). Constrained by the Anti-Terrorism and Effective Death Penalty Act of 1996 amendments to 28 U.S.C.A. § 2254(d)(1) (West Supp. 1999), however, I believe that Ake's application when the prosecution has not presented its own psychiatric evidence on future dangerousness is not clearly established by the Supreme Court. Cf. Rogers v. Gibson, 173 F.3d 1278, 1285 n.5 (10th Cir. 1999) (stating that it is doubtful that applying Ake when state has not

23

ment of Ramdass' Simmons claim. Because it seems evident that Ramdass should be able to inform the jury, by argument or court instruction, of his non-eligibility for parole if sentenced for life imprisonment, I would affirm the district court on the Simmons claim so that the sentencing jury could be accurately informed that Ramdass would be parole ineligible.

I.

A clear statement of the factual context of this case is useful to gain an understanding of the arbitrariness of the result reached by the majority.

The jury found Ramdass guilty of the Kayani murder on January 28, 1993. His sentencing hearing began the next day. At that hearing, the prosecution presented as evidence of Ramdass' future dangerousness the fact that he had been found guilty of the Pizza Hut robbery, see infra, and the Domino's Pizza robbery, see infra. The Commonwealth also emphasized that previously Ramdass had committed crimes while released on "mandatory" parole. While deliberating Ramdass' sentence, the jury asked the judge, "if the Defendant is given life is there a possibility of parole at some point before his natural death?" (emphasis added). Rather than answering that question, the judge told the jury that they were "not to concern [themselves] with what may happen" after they impose his sentence. On January 30, 1993, the jury imposed a sentence of death.

On appeal, the Supreme Court ordered the Virginia Supreme Court to reconsider Ramdass' case in light of Simmons v. South Carolina, 512 U.S. 154 (1994). Simmons involved facts almost identical to those at bar. In Simmons, a defendant was made parole ineligible by a conviction for capital murder. At the sentencing phase for that crime, the defendant requested that the jury be instructed that a life sentence would not carry with it the possibility of parole. To bolster his position, the defendant cited, inter alia , a study indicating that more than 75 percent of those surveyed in South Carolina considered

_____

presented psychiatric evidence of future dangerousness is clearly established by the Supreme Court).

24

the amount of time a defendant would actually have to spend in prison to be an "extremely important" or "very important" factor in choosing between life and death. Simmons, 512 U.S. at 159. As in the case at bar, during deliberations, the jury asked the judge a single question: "Does the imposition of a life sentence carry with it the possibility of parole?" Id. at 160. The trial judge gave a vague answer and instructed the jury not to consider parole in reaching its verdict. Id. Within minutes, the jury returned a sentence of death.

On remand in the case at bar, the Virginia Supreme Court held that Simmons was inapplicable because under Virginia law, Ramdass was not technically parole ineligible at the time the jury was deliberating his capital sentence. Under Virginia law, a felon is parole ineligible if he has been "convicted" of three offenses of murder, rape, or robbery with a deadly weapon (a "predicate conviction"); when multiple predicate convictions are part of a common act, transaction, or scheme, they are counted as only one predicate conviction. See Va. Code Ann. § 53.1-151(B1) (Michie 1998) (the"three strikes law").

At the time the capital jury was considering his sentence, Ramdass had been found guilty of five robberies and one murder.**2** One of the robberies involved no deadly weapon and therefore was not a predicate conviction. Two of the other robberies were part of the same transaction. On December 15, 1992, a jury had found Ramdass guilty of two counts of robbery and one count of using a firearm in the commission of a robbery (the "Pizza Hut robbery"). Judgment and sentence for this crime was officially imposed on January 22, 1993. At the time that Ramdass was sentenced on the Kayani murder, this conviction was still subject to a motion to set aside the verdict for trial error or insufficiency of the evidence. See Va. Sup. Ct. R. 3A:15(b) (Michie 1998). It was also subject to an appeal. See Va. Code Ann. § 17-116.05:3 (Michie 1996). The Virginia Supreme Court counted the Pizza Hut robbery as only one predicate conviction.

The final two armed robberies were also part of one transaction. On January 7, 1993, in a separate proceeding, a jury found Ramdass guilty of two counts of robbery and one count of using a firearm in

_____

**2** He was also awaiting trial on two other armed robberies, both involving assault with a deadly weapon.

25

the commission of a robbery (the "Domino's Pizza robbery"). Judgment and sentence on this crime was not officially imposed until February 18, 1993. The Virginia Supreme Court reasoned that the Domino's Pizza robbery did not count as a predicate conviction because at the time of the Kayani sentencing, Ramdass had not yet been "convicted" of that offense under the meaning of that term in the three strikes law -- although he had been found guilty, judgment had not yet been officially entered. With only one predicate conviction besides the Kayani murder, the Virginia Supreme Court held that Simmons was inapplicable because on January 30, 1993 Ramdass was technically eligible for parole.

While this result is sound under the legal technicalities of Virginia law, in practical reality it was a certainty that Ramdass would be parole ineligible upon entry of the Kayani conviction. Indeed, at the Kayani sentencing, there was no practical difference between the Domino's Pizza robbery guilty verdict and the Pizza Hut robbery guilty verdict. From January 30, 1993 until February 18, 1993, no motions were outstanding which could have affected the Domino's Pizza conviction. Ramdass claims that as of January 30, 1993, his motion to strike the evidence as insufficient as a matter of law in the Domino's Pizza robbery case, see Va. Sup. Ct. R. 3A:15(a), had already been denied. So, except for the ministerial act of formally entering judgment, on January 30, 1993, Ramdass was in exactly the same position vis-a-vis the Domino's Pizza robbery as he was vis-a-vis the Pizza Hut robbery: the finding of guilt was subject only to a Rule 3A:15(b) motion to set aside the verdict and an appeal under Virginia Code § 17-116.05:3.**3** Thus, although it was a virtual certainty at his capital sentencing that Ramdass would be ineligible for parole, the Virginia Supreme Court found that Simmons was not applicable because Ramdass was still in some technical legal sense eligible for parole.

_____

**3** The Commonwealth also points out that under Va. Code Ann. §§ 19.2-298 and -303 (Michie 1995), the court could suspend the imposition of the sentence or suspend the sentence in whole or in part. This is irrelevant, however, for two reasons. First, the Pizza Hut robbery was also subject to a § 19.2-303 suspension of the sentence. Second, regardless of whether a sentence has been suspended, nothing in §§ 19.2-298 or 19.2-303 erases the conviction for purposes of parole ineligibility under Virginia's three strikes statute.

26

Nineteen days after the jury delivered Ramdass' sentence for the Kayani murder, the ministerial act of entering judgment on the Domino's Pizza robbery was completed, giving Ramdass his second predicate conviction. The Kayani sentence and judgment was officially imposed on April 6, 1993 -- more than one month after formal entry of judgments on the Pizza Hut robbery and the Domino's Pizza robbery. When judgment for the Kayani murder was entered, that judgment, combined with the Pizza Hut conviction and the Domino's Pizza conviction gave Ramdass his third strike, making him ineligible for parole. This was exactly the occurrence of which Ramdass had requested the jury be informed.

II.

The majority takes the view that the Virginia Supreme Court's interpretation of Virginia law settles the case. I disagree. There is no doubt that the Virginia Supreme Court was entitled to interpret the word "convicted" in Virginia Code § 53.1-151(A) in the way it did. Further, we are bound by this interpretation of state law by the highest state court. This case does not hinge on the word "convicted" in Virginia law, however. The case hinges upon the requirements of the Due Process clause of the Fourteenth Amendment. In Simmons, the Supreme Court defined one aspect of this Due Process clause. Admittedly, the right recognized in Simmons is dependent to some extent upon state law: The right depends upon state parole law; the right only applies to those for whom state law has eliminated the possibility of parole. But, the right is a federal right, nonetheless, and the scope and parameter of the Simmons right is a matter of federal constitutional law.

The majority rejects a "pragmatic, functional, nonlegalistic concept" of the Simmons right. I think the majority has overlooked the genesis of Simmons. Simmons was merely an extension of the rule in Gardner v. Florida, 430 U.S. 349 (1977), and Skipper v. South Carolina, 476 U.S. 1 (1986), that "elemental due process require[s] that a defendant not be sentenced to death `on the basis of information which he had no opportunity to deny or explain.'" Skipper, 476 U.S. at 5 n.1 (plurality opinion) (quoting Gardner, 430 U.S. at 362), quoted in part in Simmons, 512 U.S. at 164 (plurality opinion), and quoted in id. at 175 (O'Connor, J., concurring in the judgment). As

27

both the plurality opinion and the O'Connor concurrence**4** recognized, the fact that the defendant will never be released from prison "will often be the only way that a violent criminal can successfully rebut the State's case [of future dangerousness]." Simmons, 512 U.S. at 177 (O'Connor, J., concurring in the judgment); id . at 163-64 (plurality opinion) ("In assessing future dangerousness, the actual duration of the defendant's prison sentence is indisputably relevant. . . . Indeed, there may be no greater assurance of a defendant's future nondangerousness to the public than the fact that he never will be released on parole.").

This principle has full force in the case at bar. At capital sentencing, the prosecution presented evidence of Ramdass' future dangerousness. Some of this evidence included the fact that Ramdass had committed the Pizza Hut robbery and the Domino's Pizza robbery. More importantly, the Commonwealth repeatedly referred to the fact that Ramdass had committed many of his crimes while on parole. The Commonwealth mentioned the phrase "mandatory parole" several times, suggesting to the jury that the Commonwealth would have no choice but to parole Ramdass at some future date. In the face of this evidence of future dangerousness, Ramdass was rendered powerless to explain to the jury that, but for what was at that point a meaningless ministerial act, he was ineligible for parole under state law.**5** Thus, under Gardner, Skipper, and Simmons, Ramdass was denied his "elemental due process" right to deny or explain the Commonwealth's

_____

**4** We have recognized Justice O'Connor's concurrence as the controlling opinion in Simmons. See Keel v. French, 162 F.3d 263, 270 (4th Cir. 1998), cert. denied, No. 98-9324, 1999 WL 317623 (U.S. June 14, 1999); Townes v. Murray, 68 F.3d 840, 849 (4th Cir. 1995).

**5** The majority sets up a straw man by asserting that Ramdass has asked us to extend Simmons to situations in which a defendant is not ineligible for parole under state law. The majority relies in part on Roach v. Angelone, 176 F.3d 210, 220 (4th Cir. 1999), Keel v. French, 162 F.3d 263, 270 (4th Cir. 1998), and Fitzgerald v. Greene, 150 F.3d 357, 367 (4th Cir. 1998), to defeat this straw man. In each of those cases, however, the defendant remained eligible for parole under state law even when all ministerial acts were completed. Of course Simmons did not apply to each of those defendants. Those cases are wholly inapposite here, where Ramdass' whole argument is based on his parole ineligibility under state law.

evidence of future dangerousness. See Simmons , 514 U.S. at 175 (O'Connor, J., concurring).

It is also important to remember the audience of the Simmons right. Simmons is concerned about the defendant's ability to present rebuttal evidence to a jury. Thus, Simmons is grounded in the right to present information which might affect a jury's decision making. Juries are not concerned about legal technicalities or remote and theoretical possibilities. They are concerned about practical realities. The Supreme Court recognized this point in Simmons. In Simmons, South Carolina argued that informing the jury that the defendant would be parole ineligible was inherently misleading because future contingencies such as legislative reform, commutation, and clemency might allow the release of the prisoner. The plurality rejected this argument, holding that the defendant could not be denied the right to rebut prosecution evidence of future dangerousness merely because of "hypothetical future developments." Simmons, 512 U.S. at 166. The court reasoned that a parole ineligibility instruction was more accurate than no instruction at all, which would inevitably leave the jury to assume that the defendant would eventually be released. Id. Nothing in Justice O'Connor's concurrence indicates that she disagreed with the plurality that remote contingencies were irrelevant to the due process analysis.

In the case at bar, the majority hides its reliance on hypothetical future developments behind a state law shield. Because Ramdass did not become technically "parole ineligible" under Virginia law until judgment was formally entered on the Domino's Pizza robbery, the majority holds that Simmons is inapplicable. But at the time of the Kayani sentencing, only some hypothetical future development as remote as legislative reform, commutation, or clemency, could have affected entry of the Domino's Pizza robbery conviction and therefore prevented Ramdass from being parole ineligible. The reason the Supreme Court rejected reliance on such future hypothetical developments is evident in the arbitrary result of the case at bar. At the time of the Kayani sentencing, the court had already rejected Ramdass' motions in the Domino's Pizza robbery case to set aside the jury's verdict before entry of judgment. See Virginia Sup. Ct. R. 3A:15(a). Formal entry of the conviction at that point was merely a ministerial act. Thus, for all realistic intents and purposes, it was a guarantee that

29

Ramdass would be parole ineligible when the Kayani conviction was formally entered.

Further, there was at the time of the Kayani sentencing no practical basis for distinguishing between the Pizza Hut robbery guilty verdict and the Domino's Pizza robbery guilty verdict. Because the Rule 3A:15(a) motions had been denied for the Domino's Pizza robbery verdict, both verdicts were subject to an identical degree of uncertainty -- either could be set aside only under a Rule 3A:15(b) motion or on appeal. Yet the majority asserts that the constitution requires us to treat the one as a certainty and the other as if it did not exist.

Splitting hairs when a man's life is at stake is not becoming to a judiciary or a legal system. I do not believe that due process requires or allows such arbitrary results. I would hold that, regardless of the technical, legalistic definition of "conviction" used by the Virginia Supreme Court, Ramdass had a constitutional due process right to inform the jury of the wholly accurate information that by the time the sentence they were deliberating was officially entered by the judge, he would be ineligible under state law for parole. I respectfully dissent.

30